OTIS ARMSTRONG AND YVONNE D. ARMSTRONG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Armstrong v. Commissioner
Docket Nos. 11177-92, 11178-92
United States Tax Court
T.C. Memo 1993-579; 1993 Tax Ct. Memo LEXIS 596; 66 T.C.M. (CCH) 1502; 18 Employee Benefits Cas. (BNA) 1014; December 8, 1993, Filed *596 Decisions will be entered for respondent. For petitioners: Michael J. Sternick. For respondent: Robert A. Varra. RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax of $ 53,675, $ 14,829, and $ 7,618, for taxable years 1987, 1988, and 1989, respectively. The Commissioner also determined a $ 13,410 addition to tax for 1987 pursuant to section 6651(a)(1). [1] At issue is whether benefits received under the total and permanent disability provisions of the Bert Bell NFL Player Retirement Plan (plan or NFL plan) are excludable from gross income under section 105(c). The facts have been stipulated. All references to petitioner in the singular are to petitioner Otis Armstrong. Petitioners resided in Highlands Ranch, Colorado, at the time they filed their petition. They are cash basis calendar year taxpayers. During the years *597 1972 through 1980, petitioner was a professional football player for the Denver Broncos Football Club of the National Football League (NFL). On November 2, 1980, petitioner was injured in a football game. As a result of the injury, he was removed from the game by the team doctor, and was not permitted to play professional football again. As a professional football player in the NFL, petitioner was covered by the Bert Bell NFL Player Retirement Plan. The plan provides for payment of retirement pension benefits to NFL players. In addition to payment of ordinary retirement benefits, it also provides for payment of benefits for total and permanent disability (T&P disability) and for line-of-duty disability (LOD disability). [2]
*598 The plan is managed and administered by a body known as The Retirement Board (the Board), which consists of seven members, three of whom are appointed by the NFL Players Association ("player members") and three of whom are appointed by the NFL Management Council ("owner members"). The seventh member is the Commissioner of the NFL, who is a non-voting member. The plan's provisions for LOD disability benefits are contained in article 6, sections 6.1 through 6.6. Section 6.3 of the plan provides that the LOD disability benefit "shall be an amount equal to 100% of the Benefit Credits of the Player at the date that the disablement occurs, * * *, but not less than $ 500 a month". [3] *600 Benefit Credits are in turn determined for each player based upon the number of seasons and the specific seasons played. [4] Plan section 6.1 directs the Board to "grant a monthly 'line-of-duty disability benefit' to a Player who incurs a 'substantial disablement' 'arising out of football activities'." [5] The term "substantial disablement" is defined in section 6.4 of the plan as: A * * * permanent disability which: A) Results in a partial bodily disability of 50%, or more; or the loss of 50% or more *599 of speech or sight; or 50% or more loss of the use of the neck or back; or B) Results in 60% or more loss of use of the hearing or an arm, shoulder, leg or hip; or C) Results in 80% or more loss of use of a hand, wrist, elbow, foot, ankle or knee; or D) Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system.
A disability is in turn deemed permanent for this purpose if it persists or is expected to persist for at least 12 months from the date of its occurrence and results in the player's retirement from professional football. Thus, a player becomes entitled to LOD disability benefits if he incurs any of the types of bodily injuries specified above as a result of playing football, and the injury lasts (or is expected to last) for 12 months and causes him to retire from the NFL, in which case he receives a monthly benefit based on his seasons of participation in the NFL, but not less than $ 500 a month. The plan's provisions for T&P disability benefits are contained in sections 5.1 through 5.4 of article 5 of the plan. The primary operative provision in article 5, section 5.1, reads in pertinent part as follows: Any Player or Vested Inactive Player, other than a Retired Player or a Player who has reached his Normal Retirement Date, who *601 is determined by the Retirement Board upon written application to be totally and permanently disabled, as hereinafter provided for, will be entitled to receive a monthly pension commencing after the expiration of a six (6) month waiting period measured from the date of such disability in an amount equal to 100% of the Benefit Credits of the Player at the date such disability occurs, * * *. Such benefits will be retroactive to the date of disability and will be payable for life or until cessation of the total and permanent disability. Effective January 1, 1983, the monthly pension shall be no less than $ 4,000 if the disability results from a football injury incurred while an Active Player. Effective January 1, 1983, the monthly pension shall be no less than $ 750 if the total and permanent disability results from other than a football injury; provided, however, that effective January 1, 1983, the monthly pension shall be no less than $ 4,000 if (a) such disability results from a non-football injury occurring within twenty-four hours from the time the Player has been placed on waivers by an NFL club, (b) the Player's contract is terminated by such club following conclusion of the *602 waiver period, and (c) such injury results in paralysis of two or more limbs. In addition, $ 50 per month for each dependent child will be payable during the period of total and permanent disability; * * *
Thus, for a T&P disability resulting from a football injury incurred while an active player, a player is entitled under section 5.1 to receive a monthly pension benefit equal to 100 percent of his Benefit Credits, but in no event less than $ 4,000 (plus $ 50 for each dependent child) per month. The term "total and permanent disability" in section 5.1 is defined in section 5.2 of the plan, which provides as follows: A Player or Vested Inactive Player, other than a Retired Player, shall be deemed to be totally and permanently disabled if the Retirement Board shall find that he has become totally disabled to the extent that he is prevented from or unable to engage in any occupation or employment for remuneration or profit, * * * [Emphasis added.]
Finally, section 5.3 of the plan states that the Board may require recipients of such benefits "to submit to periodic physical examinations * * * from time to time prior to his Normal Retirement Date," and that "If the Retirement *603 Board determines that such person is no longer totally and permanently disabled, the disability payments shall terminate." On March 11, 1981, petitioner filed an application for LOD disability benefits with the plan. The Board considered but failed to approve petitioner's request in a meeting on May 5 through 6, 1982. The Board denied petitioner's request because it could not reach agreement as to whether petitioner's injury stemmed from a "football related activity" or was instead due primarily to a congenital condition. There had been a disagreement between doctors on this matter, and the Board's failure to reach agreement resulted from the votes of the three player members in favor of petitioner and the votes of the three owner members against him. On December 23, 1982, petitioner requested that his application for LOD disability benefits be reconsidered. At a December 15, 1983, meeting of the Board, approval of petitioner's application for LOD disability benefits again failed to pass and the case was referred to the plan's Medical Advisory Board. On February 28, 1984, petitioner filed an application for T&P disability benefits under article 5 of the plan. On February 27, *604 1986, before the Medical Advisory Board had completed its determinations, the matter was removed to arbitration. The arbitrator found that petitioner incurred "a disability resulting from a football injury" (as defined in section 5.1 of the plan), and that such disability "ended his football career." The arbitrator also examined petitioner's subsequent attempts at employment in other lines of work, and weighed conflicting evidence as to petitioner's employability. He concluded, largely on the basis of the views of a majority of the three-person Medical Advisory Board, that the pain caused by petitioner's injury rendered him unemployable. Accordingly, the arbitrator granted petitioner's request for T&P disability benefits, effective from February 28, 1984, the date of petitioner's application for such benefits. However, petitioner's request for LOD disability benefits was denied. Petitioner thereafter received payments for T&P disability benefits totaling $ 191,186, $ 49,800, and $ 49,800 for the years 1987, 1988, and 1989, respectively. The payments in each of those years -- including 1987, which covered disability benefits dating back to February 28, 1984, the date of his application *605 for disability benefits -- were computed on the basis of a minimum monthly benefit of $ 4,150 ($ 4,000 plus $ 50 for each of three dependent children). Petitioners excluded the entire amounts of the T&P disability payments from gross income on their joint income tax returns (Forms 1040) for 1987, 1988, and 1989, and also on their amended joint income tax return for 1988 (Form 1040X). The Commissioner mailed two separate notices of deficiency, one for 1987 and 1988, and the other for 1989. The deficiency notice for the first 2 years stated as follows: A. The disability payments of $ 191,186.00 and $ 49,800.00 received in 1987 and 1988, respectively, were not reported on the income tax returns. Since it has not been shown that any amount qualifies as income which is excludable under Section 105 of the Internal Revenue Code, taxable income is increased $ 191,186.00 for 1987 and $ 49,800.00 for 1988. [6] *606 The deficiency notice for 1989 similarly determined that $ 49,800 did not qualify for exclusion from 1989 income under section 105. [7] We sustain the Commissioner's determinations for each of the years here at issue. Pursuant to section 105(a), payments received by an employee under an employer provided accident or health insurance plan for personal injuries or sickness are generally includable in the employee's gross income. n8 However, section 105(c) n9 grants an exception under which such payments may be excluded from an employee's gross income provided that the requirements of section 105(c)(1) and (2) are met. In brief, section 105(c)(1) requires as a condition for nontaxability that the payments "constitute payment for the permanent loss or loss of use of a member or function of the body * * * of the taxpayer," and section 105(c)(2) *607 provides that the payments must in addition be "computed with reference to the nature of the injury without regard to the period the employee is absent from work." Thus, it has been stated that in order to qualify for this exception, an employee must prove (1) that the amounts received were paid through an accident or health insurance plan, (2) that the amounts were paid for the loss or loss of use of a member or function of the body, and (3) that the amounts were computed with reference to the nature of the injury and without regard to the period the employee was absent from work. Rosen v. United States, 829 F.2d 506, 509 (4th Cir. 1987); Beisler v. Commissioner, 814 F.2d 1304, 1306 (9th Cir. 1987), affg. T.C. Memo. 1985-25; Caplin v. United States, 718 F.2d 544, 547 (2d Cir. 1983). The Commissioner on brief does not dispute that the T&P disability benefits were paid to petitioner on account of his permanent loss of use of a bodily member or function, as required by section 105(c)(1). However, the Commissioner does contend that such payments were *608 nonetheless includable in gross income, because they failed to satisfy other requirements for exclusion under section 105(c), namely, that the benefits were not paid through an accident or health plan, and that they were not computed with reference to the nature of petitioner's injury and without regard to his absence from work. Because we agree with the Commissioner's finding that the T&P disability payments under the NFL plan were not "computed with reference to the nature of the injury" and "without regard to the period the employee is absent from work", as required by section 105(c)(2), we need not decide whether the plan qualifies as an accident or health insurance plan. The amounts received by petitioner were, therefore, properly includable in petitioners' gross income for each of the years at issue. The section 105(c)(2) requirement as to the nature of the injury has been interpreted to mean that the amounts paid must "vary according to the type of injury" incurred. Hines v. Commissioner, 72 T.C. 715, 720 (1979); West v. Commissioner, T.C. Memo. 1992-617, 64 T.C.M. 1108, 1111; Estate of Olsen v. Commissioner, T.C. Memo. 1989-50, 56 T.C.M. 1199, 1200. *609 Thus, in Hines v. Commissioner, supra, which involved disability payments to a commercial pilot who suffered a heart attack, it was held that the disability payments did not pass muster under section 105(c)(2) where, under the terms of the plan, "a pilot who has [suffered] a heart attack is entitled to the same [disability] benefits as one who suffers a mental breakdown or loses a limb." Id. at 720. The NFL plan makes no such distinction between types of injuries in determining the amount of a recipient's T&P disability benefit. The amount of benefits payable under the T&P disability provisions of the plan is determined for each player by use of a formula which takes into account both the number of seasons played and the particular year relating to each season played by the player. In addition, the plan provides a floor or minimum amount -- in this case $ 4,000 (plus $ 50 per dependent) -- of monthly benefit for football injuries sustained as an active player in the NFL as well as for non-football injuries under certain limited circumstances not applicable here. Thus, apart from the minimum payment, the amount *610 of a player's T&P disability benefit is based on his specific seasons in the NFL, or alternatively on the manner in which the disability occurred, i.e., essentially whether the injury was sustained in the course of a player's active participation in the NFL. But under no circumstances is the amount of a player's T&P disability benefit affected either by the specific type or by the severity of the disabling injury sustained by him. In short, although the amount of benefit can by reason of the floor be affected by the origin of the player's injury, in no event is it affected by the nature of the injury. Petitioners' case is governed by Beisler v. Commissioner, T.C. Memo. 1985-25, 49 T.C.M. 534, affd. 814 F.2d 1304 (9th Cir. 1987). There, the taxpayer received LOD disability benefits under the identical NFL plan involved in the present case. As noted earlier, a player is entitled under the NFL plan to LOD benefits only if he incurs a career ending injury, in which case his monthly benefit is calculated pursuant to a formula based on his seasons in the NFL, subject to a $ 500 floor. We held such benefits *611 to be taxable in Beisler v. Commissioner, 49 T.C.M. at 537, stating: The amount of * * * [the taxpayer's] disability payment was not computed with reference to the nature of the football injury he sustained. The amount of the line-of-duty disability payment under the NFL Plan to all players who sustained career ending injuries and whose professional football careers spanned the same seasons are identical regardless of the nature of the injuries sustained. * * *
Our holding was affirmed by the Court of Appeals for the Ninth Circuit, which concluded that since the NFL plan made "no attempt to distinguish among the various 'substantial disablements,' even though the types and severity of these injuries can vary greatly", it did "not compute the amount of its disability payments with reference to the nature of the injury", as required by section 105(c)(2). Beisler v. Commissioner, 814 F.2d at 1309. Similarly, in the present case, the NFL plan's provisions for T&P disability benefits did not attempt to distinguish between types of disabling injuries, so long as they precluded a player from employment *612 in or outside of professional football. We reject petitioners' contention that Beisler is distinguishable. In attempting to show that in this case, unlike Beisler, the payments "are computed with reference to the nature of the injury" (section 105(c)(2)), petitioners place considerable emphasis upon the $ 4,000 minimum monthly benefits for football injuries as opposed to the $ 750 floor generally applicable to non-football injuries. On brief they state: Benefits under Article 5 are further computed depending on the nature of the injury. Article 5 of the NFL Plan provides that if the total and permanent disability results from a football injury incurred while an Active Player * * * the monthly disability payments can be no less than $ 4,000. However, if the total and permanent disability results from other than a football injury, the monthly payment is not less than $ 750. [Pet. Opening Brief at pp.8-9]
This argument misses the point. The point is that the amount of benefits payable to a player under article 5 of the NFL plan is not measured by criteria relating to the nature of a player's injury. Petitioners confuse the nature of a player's injury with *613 the circumstances giving rise to that injury; i.e., whether the injury was sustained in the course of or outside of professional football. As used in section 105(c)(2), the term "nature" refers not to the circumstances under which an injury is sustained but rather to the type or severity of the injury itself, e.g., neck injury, leg injury, loss of vision, or loss of use of a limb, etc. As far as section 105(c)(2) is concerned, a broken leg is a broken leg regardless of whether the injury occurs in an NFL game or an automobile accident. In sharp contrast, under the plan, to the extent that minimum payments are involved, whatever is paid to a player under article 5 depends not upon the nature of the injury but rather upon the place where the injury occurs, NFL football or elsewhere. And apart from the article 5 minimum, payments under article 5 are computed strictly on the basis of a player's number of seasons in the NFL and the particular year relating to each such season -- precisely the same basis on which the article 6 payments were calculated in Beisler. The fact that petitioner, unlike the player in Beisler, received the minimum monthly payments for his disability *614 does not distinguish this case from Beisler where the player's monthly payments for his LOD injuries exceeded the $ 500 minimum for such injuries. The basis for the decision in Beisler is equally applicable here. Cf. West v. Commissioner, T.C. Memo. 1992-617, 64 T.C.M. 1108, 1110, 1111. Further, petitioners' position runs afoul of the condition in section 105(c)(2) for excludability under section 105(c) that the payments must be computed "without regard to the period the employee is absent from work." Petitioner's T&P disability benefits fail to meet this requirement. The NFL plan pays T&P benefits when a player is found to be "totally and permanently disabled", which by the plan's definition, occurs "to the extent that he is prevented from or unable to engage in any occupation or employment for remuneration or profit". In such event, the plan provides that the monthly benefit for T&P disability commences from the date of disability and continues over the course of the recipient's lifetime "until cessation of the total and permanent disability." Thus the monthly T&P disability benefit to a disabled player spans a period of *615 time beginning when he first becomes unable to work and ending when he is no longer unable to work. It is difficult to conceive how the monthly benefit could be more closely tailored to a player's period of absence from work. If the point were not clear enough already, the plan further provides that if "the Retirement Board determines that such person is no longer totally and permanently disabled [i.e., unable to work], the disability payments shall terminate." It is, therefore, obvious that the T&P disability benefits under the NFL plan covered the period of time during which a player was absent from work; and that such benefits were promptly discontinued if and when a player became able to work again. As such, they were designed to replace the income lost by a player as a result of injury, not to compensate him for the injury itself, which "significantly lessens the quality of life * * * enjoyed" by the player. Berman v. Commissioner, 925 F.2d 936, 938 (6th Cir. 1991) (quoting Hines v. Commissioner, 72 T.C. at 718-719), affg. T.C. Memo. 1989-654. Cf. Beisler v. Commissioner, 814 F.2d at 1308 *616 (amounts that vary according to the time that an employee is absent from work "resemble income in that they tend to compensate * * * for lost wages"). As we have already stated in Hines v. Commissioner, supra at 720: the overall scheme of section 105(c) is aimed at providing tax relief to persons who suffer serious, permanent physical injury and receive compensation because of it. The fact that a person may have also lost wages or suffered a diminution of earnings capacity because of the injury is irrelevant. * * *
See also Maller v. Commissioner, T.C. Memo. 1984-614, where the foregoing language was quoted in the course of following Hines. We have considered various arguments made by petitioners not discussed above and have not found them persuasive. Decisions will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.↩
2. The Bert Bell NFL Player Retirement Plan (plan or NFL plan) provided for four separate types of benefits, each of which was contained in a different article of the plan: (1) ordinary retirement benefits (art. 4), (2) total and permanent disability (T&P disability) benefits (art. 5), (3) line-of-duty disability (LOD disability) benefits (art. 6), and (4) death benefits (art. 7).↩
3. Under the terms of the plan, a player who also meets the requirements for a T&P disability under art. 5, discussed infra↩, is entitled to receive the monthly T&P disability benefit in lieu of the LOD disability benefit for any month during which it is larger.
4. Under sec. 4.1 of the NFL plan, players were entitled to the following Benefit Credits for each credited season in the NFL: ↩
Credited Season
Benefit Credit
1965 and prior
$ 60
for each Credited Season
1966
65
1967
65
1968
85
1969
85
1970
110
1971
115
1972
120
1973
120
1974
120
1975
120
1976
120
1977
130
1978
130
1979
130
1980
130
1981
130
1982
150
1983
150
1984
150
1985
150
1986
150
5. Under the plan, LOD disability benefits continue for the period of the player's disability up to a maximum of 60 months. In addition, the plan also provides that if, after the LOD disability payments end, a player meets the requirement for receiving T&P disability benefits, discussed infra, he will be entitled to receive such benefits.↩
6. The Commissioner also determined an addition to tax under sec. 6651(a)(1) of $ 13,410 for 1987, based on petitioners' failure to timely file their income tax return for that year. However, the parties have stipulated that: to the extent that there is a deficiency determined by the Court for the year 1987, they [petitioners] are subject to an addition to the tax pursuant to I.R.C. sec. 6651(a)(1)↩ in the amount of 25 percent of the tax due for failing to timely file their 1987 income tax return.
Since the addition to tax hinges entirely upon our resolution of the issue involving petitioners' exclusion of the NFL plan's T&P disability benefits, it does not require further discussion.
7. The Commissioner also made an adjustment increasing taxable income by $ 6,192, the amount of previously unreported taxable social security benefits. This adjustment has not been contested. Accordingly, if we find that petitioners' exclusion of disability benefits from income during 1989 was not authorized by sec. 105↩, then the Commissioner's determination that their income must also be increased by $ 6,192 for unreported taxable social security benefits must be approved.