T.C. Memo. 1996-405


UNITED STATES TAX COURT


LAWRENCE L. AND KATHLEEN J. KELTER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6209-95.                    Filed September 3, 1996.


        P sustained work-related injuries to his hands.
For that reason, the pension plan of which P was a
member distributed to P 100 percent of his accrued plan
benefit.  R determined a deficiency in income tax based
on Ps' failure to include that distribution in gross
income.  Ps argue that the distributions are excludable
from gross income under sec. 105(c), I.R.C.
        <u>Held</u>:  The distributions are not excludable from
gross income under sec. 105(c), I.R.C., because the
amount of the distribution was not computed with
reference to the nature of the injuries sustained by P.



<u>John F. Daniels III</u>, for petitioners.

<u>Katherine Holmes Ankeny</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency dated January 27, 1995, respondent determined deficiencies of $190,189 and $45,127 in petitioners' Federal income tax liabilities for 1989 and 1990, respectively.  The only question for decision is whether certain pension plan distributions that petitioner Lawrence L. Kelter received in 1989 and 1990 are includable in gross income.  Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts filed by the parties and accompanying exhibits are incorporated herein by this reference.  Petitioners resided in Scottsdale, Arizona, at the time the petition in this case was filed.

Dr. Kelter

Petitioner Lawrence L. Kelter (hereafter, petitioner) is a dentist.  In 1987, petitioner began suffering from bilateral carpel tunnel syndrome.  Thereafter, in 1987, 1988, and 1989, petitioner underwent several surgeries in order to alleviate his pain and suffering therefrom.  The surgeries were unsuccessful in relieving petitioner's pain.  In 1987, petitioner ceased the practice of dentistry.

The Pension Plan

Petitioner had carried on his dental practice as an employee of Kelter Professional Corp. (the corporation). Petitioner was the sole officer, director, and shareholder of the corporation. On December 31, 1984, the corporation adopted the "Kelter Professional Corporation Restated Pension Plan No. Two" (the Plan), a defined benefit plan. Section 9.3 of the Plan is entitled "Disability", and provides:

> A participant who becomes totally and permanently disabled prior to his Normal Retirement Date shall be vested one hundred percent (100%) in his Accrued Benefit. The determination of the Committee based upon competent medical advice which shall include the opinion of a licensed physician shall be final as to whether any Participant is totally and permanently disabled within the meaning of this paragraph. * * * Benefits payable under this Section 9.3 shall be deemed made from a disability plan maintained by the Employer pursuant to Sections 105(c) and 105(e) of the Code.

The "Committee" specified in section 9.3 of the Plan (the Committee) consisted only of petitioner and his wife. As defined by the Committee, the term "totally and permanently disabled" meant that the participant would be unable to do any job. The term "Accrued Benefit" is defined in the Plan to mean, "at any time the monthly retirement benefit to which a Participant is entitled * * * [subject to certain limitations] commencing at his Normal Retirement Date based upon his number of Years of Participation to the date of determination."

In 1989 and 1990, petitioner received distributions pursuant to the Plan of $654,964 and $136,749, respectively (collectively, the plan distributions).  The plan distributions equaled 100 percent of petitioner's accrued benefits under the Plan. Petitioner did not report the plan distributions as items of gross income on petitioners' joint 1989 and 1990 Federal income tax returns.

There were no writings concerning any determination by the Committee that petitioner was totally and permanently disabled. The Committee determined that petitioner was totally and permanently disabled on or about November 7, 1989.

On February 20, 1986, the corporation had filed with the Internal Revenue Service a Form 5300, Application for Determination for Defined Benefit Plan For Pension Plans Other Than Money Purchase Plans.  On June 2, 1987, the Internal Revenue Service issued a favorable determination letter (the determination letter).

OPINION

I.  Introduction

The only question we must decide is whether the plan distributions constitute items of gross income to petitioner. Petitioners claim that the Plan was a dual purpose plan providing both retirement and disability benefits and that the plan distributions were disability payments excludable from gross

income pursuant to section 105(c) and (e). Alternatively, petitioners claim that, because of the determination letter, respondent is precluded from challenging the qualification of the Plan under section 105. Respondent challenges the qualification of the Plan as an accident and health plan for employees under section 105(e), claims that the plan distributions were not computed with reference to the nature of the injury under section 105(c)(2), claims that the Plan distributions did not constitute payments for the permanent loss or loss of use of a member or function of the body under section 105(c)(1), and claims that petitioners are not entitled to rely on the determination letter.

Because we agree with respondent that the plan distributions were not computed with reference to the nature of the injury under section 105(c)(2), we need not consider whether the Plan qualifies as an accident and health plan for employees under section 105(e) or whether Plan distributions constituted payments for the permanent loss or loss of use of a member or function of the body under section 105(c)(1). We also agree with respondent that petitioners are unable to rely on the determination letter.

II. Applicable Law

A. The Statute

Section 105(a) provides the general rule that amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income

to the extent such amounts are attributable to employer contributions that were not includable in the employee's gross income.  Section 105(e) provides that amounts received by an employee from employer accident or health plans shall, for purposes of sections 104 and 105, be treated as amounts received from accident or health insurance.

Section 105(c) provides an exception to the general rule contained in section 105(a):

> (c) Payments Unrelated to Absence From Work.--
> Gross income does not include amounts referred to in
> subsection (a) to the extent such amounts--
>
> > (1) constitute payment for the permanent
> > loss or loss of use of a member or function
> > of the body, or the permanent disfigurement,
> > of the taxpayer, his spouse, or a dependent
> > (as defined in section 152), and
>
> > (2) are computed with reference to the
> > nature of the injury without regard to the
> > period the employee is absent from work.

Thus, among other requirements, in order for the plan distributions to be excluded from gross income, the payments must have been computed with reference to the nature of petitioner's injuries without regard to the period petitioner was absent from work.

B.  Case Law

In Hines v. Commissioner, 72 T.C. 715 (1979), we were concerned with an airline pilot who had suffered a heart attack that, under both the rules of his employer and regulations

promulgated by the Federal Aviation Administration, rendered him ineligible for employment as an airline pilot. Under a loss of license plan maintained by the pilot's employer, because of his medical incapacity, he became entitled to certain payments. Under that plan, all medically incapacitated pilots received the same yearly benefit. We determined that the payments received by the pilot failed to satisfy the requirement of section 105(c)(2) that payments be computed with reference to the nature of the injury:

> The benefits, however, do not vary according to the type of injury received and a pilot who has a heart attack is entitled to the same benefits as one who suffers a mental breakdown or loses a limb. Thus, the payments are not computed with reference to the nature of the injury. [Id. at 720.]

We refused to accept the taxpayer's argument that payment for any injury that permanently robs an individual of his principal means of livelihood should qualify for the section 105(c) exclusion. We stated:

> We think that the overall scheme of section 105(c) is aimed at providing tax relief to persons who suffer serious, permanent physical injury and receive compensation because of it. The fact that a person may have also lost wages or suffered a diminution of earning capacity because of the injury is irrelevant.
> * * * [Id.; emphasis added.]

In Beisler v. Commissioner, 814 F.2d 1304 (9th Cir. 1987), affg. T.C. Memo. 1985-25, the Court of Appeals for the Ninth Circuit affirmed a decision of ours based on our finding that line-of-duty disability payments received on account of a career-

ending injury sustained by a professional football player were not computed with reference to the nature of the football injury he sustained. The player earned a specified benefit credit for each season he played, which was not dependent on the nature of the injuries sustained. If appealed, our decision in this case is likely to go to the Court of Appeals for the Ninth Circuit. In affirming our decision in the Beisler case, the Court of Appeals for the Ninth Circuit said: "We conclude that benefit payments, to be excludable from gross income under section 105(c), must be made under a plan that varies benefits according to the type and severity of the injury incurred." Id. at 1307. Turning to the facts of the case before it, the Court of Appeals for the Ninth Circuit said:

> Mr. Beisler's benefit payments necessarily fail to qualify for exclusion under section 105(c)(2). Rather than computing benefit amounts with reference to the type and severity of the injury, the NFL Plan, upon a showing of substantial disablement, determines them solely on the basis of the number of seasons played. The fact that the NFL Plan compensates only the most severe permanent injuries (those subsumed under the term "substantial disablement") does not cure this section 105(c)(2) defect. * * * The plan makes no attempt to distinguish among the various "substantial disablements," even though the types and severity of these injuries can vary greatly. The NFL Plan thus does not compute the amount of its disability payments with reference to the nature of the injury. [Id. at 1309; emphasis added.]

## III. Discussion

The payments in question here (the plan distributions) equaled 100 percent of petitioner's accrued benefits under the

Plan. Petitioners claim that the plan distributions were made under section 9.3 of the Plan on account of petitioner becoming totally and permanently disabled. The Plan contains no definition of the term "totally and permanently disabled", although the Committee, which consisted of petitioner and his wife, determined that the term meant that a Plan participant would be unable to do any job.

The cases cited previously, Beisler v. Commissioner, supra and Hines v. Commissioner, supra, suggest that, to satisfy the computed-with-reference-to-the-nature-of-the-injury requirement of section 105(c)(2), an employee health or accident plan must provide at least two levels of benefits, with the difference in entitlement at each level keyed to the nature (severity) of the injury compensated at that level. Whether a plan that has only one level of benefit, keyed to truly the severest of injuries (e.g., loss of all limbs or irreversible coma), would qualify is unclear. See Beisler v. Commissioner, supra at 1308 n.3. We need not deal with that theoretical possibility, however, because, although here there was only one level of benefit specified in the Plan (for total and permanent disability), we are unconvinced that the term "total and permanent disability", as used in section 9.3 of the Plan, encompassed injuries of only the truly severest kind.

The Committee determined that petitioner was totally and permanently disabled in November 1989. Petitioners propose that we find that such determination by the Committee was based on competent medical advice, "which included [the advice] of Dr. Sterusky, Dr. Moote, Dr. Butzine and Dr. Cofield." In support of that proposed finding, however, petitioners have failed to cite us to specific testimony or documents in the record that would constitute such medical advice.

A letter from Dr. Sterusky, dated May 25, 1988, states that petitioner "is permanently and totally disabled to practice dentistry". (Emphasis added.) Dr. Sterusky's office notes from October 12, 1989, express the conclusion that petitioner's medical condition is stationary and that he has a 10 percent permanent impairment of both the right and left upper extremities. Dr. Sterusky's office notes from May 15, 1990, state his belief that petitioner could drive, could work as a dental equipment salesman or dental technologist instructor, or could do dental bill auditing.

A letter from Dr. Moote dated June 14, 1988, states that petitioner will never be able to practice dentistry on account of his problems with his upper extremities. Petitioners have submitted Dr. Moote's expert witness report dated January 19, 1996. Although Dr. Moote's expert testimony is that petitioner's injuries preclude him from employment other than dentistry, that

testimony is contradicted by statements that Dr. Moote made earlier, on eight occasions from 1990 through 1992 in documents entitled "Attending Physician's Statements". In those statements, Dr. Moote gives the prognosis that petitioner is not totally disabled from performing work other than dentistry. He states that petitioner is incapable of performing those duties of his job (dentistry) that required using his hands to grip or required bending his wrists. Dr. Moote has failed to convince us that petitioner is disabled beyond being disabled for the practice of dentistry or occupations requiring similar motor skills. Moreover, petitioners have failed to convince us that, in November 1989, the Committee was in receipt of advice from Dr. Moote that petitioner's injuries precluded him from all employment.

Dr. Cofield is the consulting psychologist who evaluated petitioner on January 11, 1988. He found very significant elevations on clinical scales measuring, among other things, hypochondria, hysteria, and depression. His evaluation states that, if petitioner's condition were not checked, it could "lead to chronic unemployment and many unproductive years." Among other things, Dr. Cofield suggested personal and vocational counseling to assist petitioner in setting future goals and making reasonable plans. In his evaluation, Dr. Cofield did not

state that petitioner's psychological condition made him presently unemployable.

Dr. Butzine did not testify, nor is any copy of any report by him in the record. However, attached to Dr. Moote's expert testimony is a letter from Dr. Butzine to Aetna Commercial claims, dated March 9, 1988, acknowledging Aetna's request for the results of a psychiatric evaluation done on petitioner "regarding the issue of disability." In that letter, Dr. Butzine refuses to provide any information on the grounds that he believed that his interview with petitioner was not to be used for purposes of determining disability, and petitioner had made him promise that he would not reveal that information to anyone else. He states that the information he has "might well directly relate to the issue of disability". Petitioners did not show that Dr. Butzine was unavailable to testify. We shall assume that Dr. Butzine's testimony would have been adverse to petitioner. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

We are convinced that, in November 1989, when the Committee determined that petitioner was totally and permanently disabled within the meaning of section 9.3 of the Plan, petitioner was disabled from the practice of dentistry. We are unconvinced, however, that he was disabled from any employment, or that the Plan required such total disability from any employment before

benefits could be paid pursuant to section 9.3. The term "total and permanent disability" is undefined in the Plan, and, contrary to petitioner's testimony as to what the Committee thought that term meant, we believe that the Committee implemented the Plan by allowing petitioner disability benefits on a showing that he was disabled from the practice of dentistry without a showing that he was disabled from any employment. We find that the Plan did not vary the amount of benefit according to the type and severity of the injury suffered by the employee, and that the Plan's requirement of total and permanent disability was satisfied on a showing of disability to practice dentistry. Based on those findings, the Plan failed to meet the requirements of section 105(c) that payments be computed with reference to the nature of the injury. This case is similar to both Beisler v. Commissioner, 814 F.2d 1304 (9th Cir. 1987), and Hines v. Commissioner, 72 T.C. 715 (1979), and we are governed by the results therein.

Petitioners argue that both this Court, in the Hines case, and the Court of Appeals for the Ninth Circuit, in the Beisler case, misconstrued section 105(c) in imposing a requirement that benefits vary in accordance with the nature of the injury. In petitioners' view, it suffices that benefits are paid on account of injury or sickness and without regard to the period the employee is absent from work. Petitioners claim: "There is no

basis to impose any requirement that a plan must vary payments in accordance with the type of injury." That is the same argument that was made to the Court of Appeals for the Ninth Circuit in the Beisler case. It was rejected by the Court of Appeals there, 814 F.2d. at 1308, and we reject it here. Like the Court of Appeals, we have examined the legislative history of section 105(c). We believe that it is insufficient to satisfy the section 105(c) requirements for exclusion that payments are made without regard to absence from work and on account of injury or sickness. We agree with the Court of Appeals, 814 F.2d at 1308, that petitioners' interpretation would make the nature-of-the-injury language superfluous. Under petitioners' interpretation, section 105(c) would be satisfied if the Plan had been designed to pay petitioner 100 percent of his Accrued Benefit (his retirement benefit) if he had gone deaf in one ear. See section 1.105-3, Income Tax Regs. (loss of substantially all of the hearing in one ear is considered loss of use of a function of the body). We do not believe that result comports with Congress' purpose in enacting the section 105(c) exclusion rule.

Finally, petitioners claim that, because of the determination letter, respondent is precluded from challenging the qualification of the plan under section 105. We disagree. First, we are unconvinced that the corporation asked for a determination with respect to section 105 or pointed out to the

Internal Revenue Service that the Plan, clearly labeled a pension plan, contained a section dealing with disability. Second, the determination letter does not purport to deal with the taxability to plan participants of distributions made under the plan. Third, petitioners have failed to show any reliance on the determination letter, that any such reliance would have been reasonable, or that they were damaged on account of such purported reliance. "Although the doctrines of estoppel and quasi-estoppel are applicable against the Commissioner, it is well established that these doctrines should be applied against him with utmost caution and restraint." Estate of Emerson v. Commissioner, 67 T.C. 612, 617 (1977) (citations omitted). This is not an occasion for such application. Furthermore, respondent has done nothing to revoke her determination letter, and, even if she had, petitioners have failed to show reliance or other grounds to challenge such revocation.

IV. Conclusion

The plan distributions constitute gross income to petitioner. Respondent's determinations of deficiencies are sustained.

Decision will be entered

for respondent.